Good morning, your honors. Patrick McGillicuddy, appointed counsel for Mrs. Charley. The first issue I'd like to discuss with the court this morning is the competency issue of the defendant. I think the government and the defense agree on the standard. I couldn't see the difficulty there. It looked to me like the judge considered the evidence, made a finding, there was evidence to support it, regardless of what feelings we might have, nothing we could do about it in view of a finding supported by the evidence. In any way, I'm not sure I have a problem with it. I mean, the challenge is she wouldn't take her lawyer's advice. She insisted on this ridiculous story that the five-year-old did it. Boy, that's just typical of criminal defendants. A lot of them aren't that smart and they insist on doing stupid things. It's often how they got in trouble in the first place. Well, and as a lawyer who's represented criminal defendants for 25 years, I tend to agree with the court on that issue. However, based on the record in this case, I don't think it's as clear cut as one might expect. First of all, your honor, the circumstances leading up to this case were made very clear in the record. Mrs. Charley was in the process of a divorce. She lived on a very isolated and lonely area of the Navajo Reservation. Her home was without electricity, heat. She had to haul her own water. She was really forced into ---- I come from Fairbanks, Alaska, where people think that's really neat. All the university students, they go out and live in cabins where they haul their own water. No electricity or heat. What I think this record shows is those circumstances based and together with Mrs. Charley's deteriorating mental condition, which was amply demonstrated by the reports that the court relied on and also the background information that was presented to the court, certainly would give rise to a belief that if any individual, criminal defendant or otherwise, might deteriorate in a criminal trial, it would be Mrs. Charley. She obviously was severely emotionally battered. She was depressed. Some of the ---- It also is a very tragic case. I mean, there's no question about it. Yes. But the psychological assessments was, were, that she was not legally insane, i.e., she understood what was happening and she had the capacity to assist her lawyer. What is your response to that? Well, my response is this. I am aware, as I set forth in the brief, that the government's expert, Dr. Shattuck, found or opined that the defendant was competent to stand trial. I think he, in passing, and the other experts in passing, indicated that there wasn't sufficient evidence to believe that Mrs. Charley had a legal defense of insanity, and I don't think that was ever seriously advanced by her attorneys. They also addressed competency, though. Excuse me? They also addressed competency. That's correct. And those doctors did, at the time of the evaluations, Dr. Morenz, who was the government's attorney, and also Dr. Herring, who was, I believe, a psychologist employed by Dr. Morenz to do some background psychological testing, all indicated at the time that Mrs. Charley was competent to stand trial under the standard. And I didn't dispute that in my brief. What I think the crux of my issue, and to answer your question, Your Honor, is this, that Mrs. Charley presented a very vulnerable mental and emotional background, and the indications were there in the reports that Mrs. Charley could be subject to decompensation and deterioration of her mental and emotional condition as time went on. And I submit that's what happened in this case, Your Honor. As I've said before the judge, here's my understanding of it. Here's, can you, is this mic on? Can you hear me now? Yes, sir. Okay. Here's my understanding of it. We have one team with Dr. Shattuck says that she is competent. Then we have a couple of other doctors for the defense, Dr. Herring, Dr. Morenz, say she has a bunch of problems, but they seem to stop short of saying she's incompetent to stand trial. And then the judge makes a finding, so current competence to stand trial. You claim during trial, or in the month before from the order until she gets to trial, that she deteriorates. What was presented to the judge on that? The lawyers for Mrs. Charley at, and I don't want to misstate the record, but prior to the trial beginning, I believe they presented Judge Carroll with their views regarding Mrs. Charley. And one of the cases I cited, I think it was Grove, said that a court should consider carefully, it's not binding, but should consider carefully what the lawyers say about their client, because they have the best picture and are closest to her. Is there a motion to reopen this or anything like that? What was there formally on the record and where, that if you accept the judge's finding that she's competent to stand trial, or you may disagree with it, but it's supported by evidence in any event, as Judge Nelson noted, what is there formally after that? During the trial and prior to Mrs. Charley testifying, the lawyers met with the judge ex parte, and they advised the court that in their view, Mrs. Charley had decompensated to the point where they didn't think she was competent to continue the trial. They asked for a mistrial. They asked for further testing. They gave their observations to the court. And I think it's in the excerpt of record, but it's right near the end of trial, near the last day of trial. And both Mr. Gordon and Ms. Oiler-Ayahi advised the judge that they were very reluctant to come forward at such a late day, but they felt they had an ethical duty and they felt they had a duty to the court to present the observations that they had made. Now, this wasn't the first time in this record that a situation like this occurred. In your brief here, your fellow brief, do you raise an issue about denial of an order or denial of a motion toward the end of trial? I know you raised a challenge to the initial competency ruling and a challenge to the determination she's competent for sentencing. But now you're talking about a mid-trial, near the end of the trial, in-camera discussion. Is that raised in your brief? And is there a formal motion on that? There was a – it was raised in the brief, Your Honor. I did argue in the brief that Mrs. Charlie was incompetent to stand trial and be sentenced. I think – or – You argued that. But I understood you were challenging the initial competency determination. And that you were challenging the determination she could proceed to sentencing. But now in your oral argument, you're making an argument that during the trial, there was some reassessment by her counsel. And what I'm asking is, did you raise that in the brief? I think I did, Your Honor. I made the general argument, and maybe not with the specificity that the court would have liked, but the general argument that I made was that Mrs. Charlie was not competent during her trial. And then I set forth the examples which I believe supported that assertion. What do you do with this language by the judge? Let's see. I don't see bait stamps here. Your tab looks like ER11. I think it's your tab. And the page number in the top right is 14. And I don't know if I've got the context right, but I think this is the judge talking after this has been raised as reason for mistrial. And the judge says, and the court has observed the defendant, not with respect to other than her demeanor in court, her awareness of the proceedings, her taking occasion to be able to look at a witness, moving or changing her position in order to do that, to at least discuss matters with counsel. And she's not been irrational in court or at any time before the court or given any indication whatsoever that she has some current mental state that would affect her ability to know where she is or what she's doing. So we will proceed. Was the judge at that point making a finding and rejecting the mid-trial claim? I think he did, Your Honor. And it was in the context of that situation, I think. You're saying I've been watching her during the trial, and I don't think so. That's what he said. I think that's a fair assessment of the judge's comments. I think what happened, Your Honor, is that the lawyers for Mrs. Charlie had been meeting with her the night before. And I think they alluded to that to the court, and they indicated strongly to the court that they wrestled with this issue. I didn't think that what the lawyers raised was that persuasive, basically her defense that the 5-year-old did it and the sweater in the car would show that because it had blood on it and the 5-year-old was wearing it. What I'm thinking is, yes, it's a stretch, but if the jury wanted to give her a break, that would be a peg they could hang a reasonable doubt on. We once had a case in my town where a lawyer got a woman off who killed her husband with two shots from a shotgun, a double-barrel shotgun, on a ground that the dog did it. The dog jumped up on her. Paul got inside the trigger guard and pulled both triggers. And, well, the jury wanted to give her a break. They thought he had it coming. And I'm not familiar with that case in Fairbanks. Well, to good appeal, it was an acquittal. It sounds like a very interesting one. I would imagine. Good defense. Yes, and I would imagine that the record in that case probably indicated that the defendant, a woman, had been subjected to perhaps the deceased's abusive tendencies. Maybe there was some alcohol. Who knows? In this particular case, Your Honor, the backdrop for Mrs. Charlie, as reported by the government's expert and also by the defense psychiatrist and psychologist, indicated clearly, in my view, that Mrs. Charlie had serious mental health issues. Well, it looked like she was an FAS child with impaired intellect and judgment, actually. But that still doesn't make her incompetent to stand front. Well, but it certainly is the context for this court to find that she was, because not only did you have fetal alcohol syndrome, which, to be perfectly clear with the court, it was alluded to by, I think it was Dr. Shattuck, but I don't think it was ever clearly determined that she was. But I think, and this court would be very familiar with this as well, certainly fetal alcohol syndrome can cause brain damage. And there was significant indications both by Dr. Shattuck. Like organic brain damage. Correct. But that's still not incompetent to stand trial. But in the context of this trial, it certainly indicates that this was, first of all, this was not a person who just had maybe a slight personality issue or maybe she had some anxiety or maybe she was taking a little Paxil for depression. This was a woman who had just been battered by her husband in life and had significant mental health issues to deal with. We've got a tough standard of review on this competency issue because we review it for clear error. And there is some evidence of her competency. I'm wondering if you might want to address some of the other arguments you're asserting. Yes, I will, Your Honor. The second argument that I raised and that I'd like to address here was the jury instruction. The judge gave the standard model instructions for first-degree murder and second-degree murder. The defense initially objected, and then the record is pretty clear that they withdrew their objection. Now, one of the issues that I raised as far as the standard of review, it's under Alano if the defendant fails to object, the standard is plain error. However, there were several cases that I cited with respect to the standard of review that have to do with misleading instructions, and that standard of review for the court then would be de novo. And I raised those two standards because it was my review of the record indicated that the defense did withdraw the objection, so it would be a plain error review, which obviously is higher. But the instructions themselves, in my view, appear to mislead the jury. And the basic nub of that argument is that the instructions defined second-degree murder. It's hard for me to see how you could ever find plain error in giving an instruction that's just copied from the form book when there is no case that says the form book instruction is wrong. Well, there's a case that I cited, and I think the name of it is now escaping me. We've done it before. I think you've done it before. Right. And I think one of the cases I think I cited was Lacina, and that was about a 15-year-old case. And if I recall correctly, the district judge in Lacina used the model instructions to define, I think it was, manslaughter and second-degree murder. But isn't Lacina distinguishable in that case it made it appear that there was no difference at all between first-degree murder and second-degree murder? And in this case, it was made clear, I thought, that even though the instructions were somewhat confusing because they used the words deliberate and deliberately, it was clear from the instructions that first-degree murder required an element of premeditation that was not required in second-degree. Isn't that true? My answer to that, Your Honor, is that the difference was illusory because the judge, per the jury instruction, defined, and I want to make sure I get this correctly, defined. My argument is that the judge, as I understood it, was that the judge defined malice of forethought in second-degree murder as including an intentionally deliberate act, and that for murder one, you had something done deliberately with something with premeditation. Right. It was also defined as having an element of deliberation. So you're pointing to tension between deliberation as relevant to premeditation. Yes. And deliberate act as relevant to malice of forethought. Correct. And that's a clear error. I believe it is because I don't see how a jury could distinguish between those two mens rea elements based on the use of the same word, which conveys the same mens rea. That was the problem in Lacina, and this Court reversed. And in my reply brief, I found a couple of other cases, Paul and Jones. Not quite the same word, deliberate and deliberation. Well, in my reply brief, I did submit the Webster's definition, and that, that's a page. Well, I think they convey the same meaning. Webster says. If you shoot someone in the heat of passion, and you're in the heat of passion, and your shooting is deliberate, it's a volitional act, but you haven't had deliberation before you did it. I mean, a person got mad because of some event they had, and they lost control. They knew they were shooting deliberately, but they didn't premeditate before they did it. But if I understand your example, Your Honor, the difference would be the heat of passion, because the jury would then be able to say, well, of course, it was a deliberate shooting, but the mental aspect of the shooter was such that we can reduce it rationally and with a rational basis to a lesser criminal homicide. My view in this case, and Webster's backs me up on this, it says the word deliberate means to think or consider carefully. The term deliberation means considering carefully. In my view, Your Honor, that's the same thing, and I don't know. You can always pick definitions out that will work that way, but I'm thinking I could engage in deliberation, yet through accident not act deliberately in accord with my deliberation, and I could act deliberately without having done any deliberation. I could do something on purpose without having given it much thought beforehand, and I could give something thought beforehand and then accidentally do the opposite of what I meant to do. Well, perhaps, but the jury instruction in this case, I don't think, really gave any guidance to the jury on how they were to differentiate premeditation, which used the word deliberate, and malice aforethought, which used the word, I think, deliberately. Interesting argument. Are you going to – I mean, your time is sort of up, but I hope that Judge Kreinfeld will let you go a little further and then let the government take a little time if it needs it, because I wanted to hear at least briefly on your custody Miranda argument. Well, I was prepared to submit that issue on the briefs. Okay. That's fine. And I am out of time, but if the Court has any further questions and the government doesn't object, I'm happy to try and answer them. Thank you, sir. We may give you one minute for rebuttal anyway. Thank you very much. Keep taking notes. Good morning. Joan Rufinog, appearing on behalf of the United States. If I can, I'd like to clarify something in the government's brief that I don't think is as clear as it could have been. With regard to the competency issue, the pretrial issue, the only information that was before the district court at the November hearing was the report of the government doctor, Dr. Shattuck, and Dr. Shattuck's testimony, and the letter from Dr. Morens that was filed in August that said because of the EEG results, we have a defendant who's at risk for suffering from partial complex seizures, and therefore an evaluation should be done. So the report of Dr. Herring, while it was prepared prior to that hearing, was never given to the district court until sentencing in September of 2003. And Dr. Morens' report, the other defense expert, did not even prepare a report until April of 2003. So well after the November hearing that the district court had. So the district court, with only the testimony of Dr. Shattuck and the report of Dr. Shattuck, clearly did not err in finding that the defendant was competent for trial. What about the, okay, we're past the initial trial determination. What about the incident toward the end of the trial where there's a request for mistrial? What happened was on January 15th, the trial began on the 7th, so you're eight days into the trial, defense counsel comes to the court and says, Your Honor, we have a concern about the defendant's competency. And that is based not on the fact that she intends to offer this defense that her five-year-old did it. We don't think that that raises a competency issue. She first raised that in August, and we think that that's a jury question. However, what she's currently telling us for the first time is that when the murders occurred, she heard what she believed to be frog sounds coming from the children. The court found that based on that information, that at most it would go to the defendant's mental state at the time of the offense, not her mental state or current competency to stand trial or to continue in the trial. And the government submits that that was not a clearly erroneous decision, particularly in light of the fact that the very next day the defendant testified over 110 pages of testimony that was coherent, rational, nothing's been pointed out other than her theory of defense, which as the court pointed out, she'd already confessed so many times to having murdered her children that that was basically the best that she could do on the facts as they existed. How about competency for sentencing? Competency for sentencing, again, you have no doctor finding that she's incompetent to be sentenced. What happened was she went down to Tucson for examination. The doctors there were again concerned. The district court sent her back to Carswell for a 30-day commitment. Dr. Shattuck looked at her again and said, you know, at this point the defendant is willing to recognize that she does have some mental problems. She's suffering from depression. She possibly has post-traumatic stress syndrome. But those things don't impact her ability to understand what's going on or to assist her counsel. She's got good memory. She can discuss all of the relevant factors regarding sentencing. But we're going to we recommend a provisional sentence because she is in need of care or treatment. We think she's at risk for suicide. Therefore, the best place for this woman to be is in a medical facility as opposed to a standard BOP facility. And the government submits that on record again before the court where no one said she was incompetent. They just said she's got a mental disease or defect that's making her a danger to herself, that there was no clear error in the district court's decision. On the sentencing, the defense makes an argument by analogy to Lucina. And it's not totally off the wall. You know, like Lucina, as I understand it, there was a definition in jury instructions of callous or reckless disregard maybe for second degree injuries. And often a reckless disregard for involuntary manslaughter. And those phrasings were somewhat overlapping or similar. And I think that was also patterned jury instructions. And I think that was also a plain error issue where no objection had been made. So if I'm right in what I've said, I may have gotten it a little wrong, but I'm probably in the ballpark describing Lucina. How do you distinguish Lucina? I actually think the Court might be talking about Paul as opposed to Lucina. Paul is also – because Lucina and Paul are both addressed in the reply brief. But in this case, what we have, this Court finding that the definition of malice of forethought that was given by the district court is a correct definition. In United States v. Hauser, which is cited in the government's brief, this Court approved the definition of malice of forethought as to kill with malice of forethought means to kill either deliberately and intentionally or recklessly with extreme disregard for human life. So we know that this Court's already ruled that that definition is appropriate. Therefore, the question becomes, since the only distinction between first degree murder and second degree murder is the element of premeditation, whether the definition of premeditation is somehow confusing in light of the proper malice of forethought instruction. And the government submits that it is not confusing. The definition that was given of premeditation is premeditation means with planning or deliberation. The very sentence gives the jury an idea that deliberation means planning. It's synonymous with planning. So the government submits that a juror of common intelligence can distinguish between the definition premeditation means with planning or deliberation and the malice of forethought definition of deliberately and intentionally. Because, again, in that very sentence, you have deliberately and intentionally modifying each other, being synonymous words, clearly giving a jury the understanding of what they are supposed to find. Well, I'm looking at my copy of Lucina, and it is the one I was thinking of. Okay. I wasn't thinking of Paul. And I still want to know, from your point of view, what's different with Lucina? Because it may be that the individual definitions there have been approved also. So, I mean, the problem is not even one definition alone. It's what I think. It's whether the combination of the definitions in proximity are not going to be properly understood by the jury. I believe that in Lucina the same definition was given, that rather than, as I recall, I think it was second degree and voluntary manslaughter. And it was the definition of it was recklessly or. Okay. The second degree murder charge said it had to be callous or reckless disregard for human life. And what this Court has said is that's an incorrect definition because second degree requires extreme disregard. And they found, the Court found that callous or reckless disregard was a lesser standard and equated with voluntary manslaughter as opposed to second degree murder. The involuntary manslaughter charge given in that case was for wanton or reckless disregard. Right. You're saying that the second degree charge was understated? Correct, because it's extreme disregard. And I believe what the Court found was that when you said callously or recklessly, you could convict under a negligence standard as opposed to the extreme disregard that's required for second degree. And in this case, the distinction is premeditation is required for first degree. Premeditation is not required for second degree. So it was made clear in the instructions in this case. Absolutely. Okay. How about the custody issue? It was submitted on the briefs by the appellant, but it's a significant issue. How did the government respond to whether she was in custody when she was picked up at the relative's house and driven to her house? I'd submit that the record is very clear that the defendant was not in custody at the time that she was transported from her relative's house to her own home because the defendant is the one who summoned police to the residence. She called 911 to report that something had happened. She'd done something very bad. They need to send an ambulance the whole nine yards. After she makes that phone call, when the police get there, the family is concerned about why emergency personnel are there. They have no idea what's going on. So the defendant is taken outside by the EMT, while the police officer explains to the family that there's been a 911 call, and therefore they're going to take the defendant to her house to find out what's going on. The only testimony at the suppression hearing is by the police officers. The defendant did not testify, nor did she present any witnesses. And the testimony at that hearing was that the defendant voluntarily handed over the keys to her house and said, you need to check on my kids. Something bad's happened. Without asking any questions, the officer says to the defendant, you are not under arrest, but we are going to detain you for purposes of taking you to your house to find out what's going on. Was she free to leave at that time? No. They said that the officers wanted to find out what was going on because ambulances had been summoned, police had been summoned, something was going on, but they didn't know what. So while she wasn't under arrest, they wanted to keep her. It's like a Terry stop. Basically, yes. Except she's moving. Correct. There aren't many cases. I know there's some, but there aren't too many cases. It's kind of a moving investigative stop. Basically, that's how I would say. What cases are there in the Ninth Circuit that you're aware of? Well, to some extent, I think you can look at Crawford, which is cited in the government's brief, because in Crawford, it's different in the context that it was the parole search, and it was an illegal parole search, but then they asked the defendant if he'd be willing to go to the FBI offices to be interviewed. He agrees to go to the FBI offices. And if the court looks at the defendant's trial testimony in this case, and it's cited in the government's brief in a footnote, the defendant testified at trial that she willingly went with the officers to her house to check on the welfare of her children. She wanted to go with them. So in light of that trial testimony, which this Court can consider in determining whether evidence should have been suppressed, I submit that it's clear that the evidence should not have been suppressed, because she was not in custody. She definitely wanted to go with them. She wanted to go. But that doesn't necessarily go to the answer if she was in custody. Well, but I would submit, again, that it is more like the Terry stop, because you've got an explosive situation, they need to find out what's going on, so they brought her to the location. She is detained. She's not free to leave. But it's temporary, and it's not considered custody, because why? For Miranda purposes, because they're merely trying to find out what's going on, as opposed to detain her as in an arrest situation. In light of her call to 911. Right. And then once the Court also has to understand that during that period of time, she was not questioned. She made some comments about the fact that they needed to hurry. And once they got to the residence, the agent or the officer held up the keys and said, do I have your permission to go into your house? And she said, yes, hurry up, the kids are in the bedroom. So there was no questioning during that time. There was just volunteered statements both to the EMT, to whom she admitted that she had shot her children, and to the officer when he held up the keys to ask permission to go in. And then it was only after the officer went into the house, found the deceased children, came back out, got the background information as far as booking information, Mirandized the defendant, and she admitted to having killed the children. So I'd submit that on that record, again, undisputed record, that she was not in custody for Miranda purposes, that in any event there were no Miranda violations because there were no questions asked. The statements were volunteered. And so there was no constitutional violation in what occurred. Do we have to reach any of that? It seems like, first of all, she repeatedly confessed at times other than during this detention that may have been a Terry stop. And, second, her defense was, yeah, of course I confessed. I was trying to protect my 5-year-old by lying and taking responsibility for a crime I didn't commit. That's correct. But, I mean, I would definitely agree with the Court that, yes, that's the proper analysis. So do we even need to reach this? I'm a little wary of making law in an area where there isn't already a law. Wasn't her later confession a fruit of the first statement? Is that as unconstitutional? Well, yes. I suppose you could argue that. But because the FBI interviewed later that day once she was in custody. So I suppose that if she then ---- You're not going to claim attenuation for that? Oh, absolutely. Absolutely. I'm just saying that that argument can be made. That's the law in the way it strikes me. You either have to find, I mean, if it was not a valid investigative detention, then you either have to make law that it's sufficiently attenuated, which it might not be, or you have to make law that it was okay in the first place. I think that the Court has to decide whether or not she was ---- I agree. I'd like to retract my initial answer and say I think you do have to determine whether or not the initial detention was good or not. And by that I mean constitutional with Miranda rights given and what have you, because there was the subsequent investigation by the FBI, an interview by the FBI, which was the result of her having been taken into custody at the scene. And the trial was custodial. What was the interrogation that was going on while it was custodial? As I said, there was no interrogation until after the officer had gone into the house, seen the deceased children, and came back out. It was at that point, once he had probable cause, he Mirandized her. He did say to her, I need to get some information from you. What's your name? What's your census number? What's your Social Security number? After he had that information, he Mirandized her. He Mirandized her pursuant to the standard Miranda rights. She waved verbally. And after waving verbally, he then asked her questions. So, again, even if so, even if this court were to find she was in custody for Miranda purposes, because there was no questioning, there was no violation. The questioning happened after she'd been detained for the investigation. The investigation proved to be of a criminal that a crime had occurred. He had probable cause at that point to arrest her. So she was properly detained. She was Mirandized. She waved her rights. The statement was voluntary. I'm sort of inclined to think that this is an investigative detention. But if it's not, and if she's in custody, then I'm not sure what the state of the law is on whether they have to immediately give her Miranda warnings or whether the Miranda rights would only kick in upon some active questioning. I mean, can the police take someone in custody and put them in a cell and, you know, put a video camera on them or sit there staring at them without making any overt questions, and then if the person says something, use it against them? Is Miranda only invoked upon the questioning? Absolutely. And I'm going to see if I can find the case really quickly. And if not, I will submit the citation to the court after, because I am absolutely certain that that is the case. Miranda only has to be given if there's an intention to question. Rather than waste the Court's time, is it okay if I submit a 28-J letter or? We'll tell you if we need it. Okay. Are there any other questions? If not, we'd ask that the Court affirm the conviction and sentence. Thank you, counsel. You used up your time, counsel, but take one minute anyway. Thank you very much. With respect to the two arguments that were made by Ms. Wufenau, I think the fact that the defendant was provisionally sentenced to life terms and for the reasons that the government advances, that she had serious mental issues, that she was a danger to herself, I think that supports the argument that her mental health background certainly gives strong support to the fact that, as I argued, she was incompetent. Secondly, with all respect to the government, I don't know what they advanced to this Court that would distinguish the instruction for first-degree murder, which is premeditation, and second-degree murder, which is malice aforethought. The judge instructed the jury regarding premeditation, and he used the disjunctive planning or deliberation. So even under the government's theory, the jury could have used the same mental state for second-degree murder and substituted that for first-degree murder. That's why I think there was plain error. Thank you very much. I enjoyed it. Thank you, counsel. United States v. Charlie is submitted. We are adjourned until 9.30 a.m. tomorrow. Thank you.
judges: D.W. Nelson, Kleinfeld, Gould